**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**JOHN L. BROWN & ROBERT PURNELL**                                      **PLAINTIFFS**

**VERSUS**                                      **CIVIL ACTION NO. 3:08cv559KS-MTP**

**NATIONAL RAILROAD PASSENGER
CORPORATION AND ILLINOIS CENTRAL
RAILROAD COMPANY**                                      **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the court on a Motion for Summary Judgment **[#246]** and on a Motion to Exclude Testimony of Dr. Gary Long **[#255]**.  The court, having reviewed the motions, the responses, the pleadings and exhibits on file, having conducted oral argument and being otherwise fully advised in the premises finds that the motion to exclude the testimony of Dr. Gary Long is well taken and should be granted and that the motion for summary judgment is well taken in part and should be granted in part and denied in part.  The court finds specifically as follows:

<u>**BACKGROUND**</u>

At approximately 1:00 p.m. on May 27, 2008, the National Railroad Passenger Corporation (Amtrak) was operating a southbound passenger train with more than 100 passengers over and along railroad tracks owned and maintained by Illinois Central Railroad Company (which is part of the Canadian National Railway Company), just

north of Crystal Springs in Copiah County, Mississippi.  The Amtrak train, consisting of a locomotive and six passenger cars, was being operated by engineer Mervill Cheatwood, with Assistant System General Road Foreman Mark Burris also in the locomotive.  Prior to the collision, the Amtrak train was traveling at a speed of approximately 80 miles per hour.

At approximately the same time, John Brown, an employee of Waste Management[1], was operating a Mack rear-end loader garbage truck that was owned by Waste Management.  Waste Management employee Robert Purnell, who was serving as the helper on the route, was riding on the rear of the truck.  Brown and Purnell were working on the Copiah County residential route pursuant to a contract between Waste Management and Copiah County, Mississippi.  Brown had been on this route for three to four years and picked up garbage in this area twice a week.  He testified that he had driven over this crossing hundreds of times.  Purnell had been on this route for eighteen months.  Neither had ever expressed any complaints about this crossing before the accident.

Brown turned right off of County Line Road onto Hartley Lane, which crosses the Illinois Central tracks approximately 55 feet from the intersection.  After turning westerly onto Hartley Lane, the Waste Management truck was struck by the Amtrak train.  Brown and Purnell were both thrown from the truck, which was torn into several pieces.  The Amtrak locomotive subsequently derailed.

Brown and Purnell were critically injured and transported from the scene to the

---

[1]  Waste Management of Mississippi, Inc. was formerly a plaintiff/counter-defendant in this case but has since been dismissed due to settlement.

hospital.  Several Amtrak employees and passengers were also transported to area hospitals for treatment of minor to moderate injuries.  The Waste Management garbage truck was totaled.  Neither Brown nor Purnell recall events related to the collision.

The Hartley Lane crossing is at the skewed intersection of a single mainline railroad track running north and south.  Hartley Lane is a rather narrow, two-way, paved roadway running east and west.  The Hartley Lane pavement in the crossing vicinity was 16'-7" wide on the east side.  On the west side of the track, the pavement was 11'-0" wide.  The crossing is equipped with advance warning signs and cross-buck signs.  Testimony reveals that visibility at the Hartley Lane crossing is good.  From the advance warning signs twenty-two feet from the eastern most rail one can see approximately 2600 feet to the north.

At least two witnesses in the neighborhood of the Hartley Lane crossing at the time of the subject accident have testified that they only heard one blow from the train horn immediately before the collision.  *See* Deposition of Christopher Murray, Deposition of Betty Williams.  Other witnesses in the vicinity testified they did not hear the train's horn at all but did hear the collision.  *See* Deposition of Ernest Herron; Deposition of Leon Sartin, III.  This testimony disputes the Railroad's own event data recorder regarding (EDR) the sounding of the train's horn. The EDR shows that the horn was blown beginning 1,170 feet prior to the crossing and continuing to the crossing.

Another witness, George Lewis, was traveling in his car parallel to the Amtrak train on County Line Road as the train approached Hartley Lane.  He has testified that he heard the horn as the train emerged from the tree line well back from the crossing. He also testified that he saw Brown turn the garbage truck onto Hartley Lane and onto

the crossing without stopping.  He witnessed the crash.

The federal maximum speed limit for this Class IV track was 80 miles per hour. The EDR on the train indicates that it was traveling at 79 mph and that the horn was activated 1,170 feet before the Hartley Lane crossing.  Cheatwood, the engineer, testified that he saw Brown turn the truck onto the crossing and never stop.  He realized there was going to be a collision and applied the emergency brake some 232 - 349 feet from impact according to the EDR.  Cheatwood then fell to the floor.

The plaintiffs had originally brought claims for: 1) excessive speed and failure to issue a slow order; 2) failure to maintain the roadway surface and crossing approaches; 3) failure to maintain adequate sight distance; 4) failure to sound the train's horn as provided by Mississippi law: and 5) failure to install active warning devises at the crossing.  Prior to the oral argument in this matter, the plaintiffs dropped all claims except; 1) AMTRAK failed with regard to its duty to blow the horn; 2) Illinois Central failed with regard to having necessary active signalization or any other improvements at the alleged extra-hazardous crossing so as to make it reasonably safe; and 3) Illinois Central failed to properly maintain the ballast and should have issued a slow order on account of weak ballast, which would have resulted in the train's running 25-30 mph rather than 79-80 mph, which probably would have averted the collision.  The plaintiffs also stated that "[u]nder #2 (signalization), of course we will offer proof as to why the crossing was extrahazardous, such as the skewed angle, rough roadway surface, humpback shape, restricted sight distance, etc., but we will NOT be claiming that any of these defective conditions other than to actively signalize, standing alone, proximately caused the collision, and will not offer or request any jury instructions like that."

-4-

The court excluded the testimony of Alan Blackwell, an expert for the plaintiffs, at oral argument and granted summary judgment on number three above, the excessive speed/ballast/slow order claim.  Thus the only claims left are the horn claim and the active signalization claim.  The defendants have moved to exclude the testimony of Gary Long, the plaintiffs' expert on the active signalization/extra-hazardous crossing claim and for summary judgment on that claim and the horn claim.

## STANDARD OF REVIEW-SUMMARY JUDGMENT

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FRCP 56(c); and *see Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is

not limited to that role.  *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*,

799 F.2d 218, 222 (5th Cir. 1986).  "The mere existence of a disputed factual issue,

therefore, does not foreclose summary judgment.  The dispute must be genuine, and

the facts must be material."  *Id.*  "With regard to 'materiality', only those disputes over

facts that might affect the outcome of the lawsuit under the governing substantive law

will preclude summary judgment."  *Phillips Oil Company v. OKC Corporation*, 812 F.2d

265, 272 (5th Cir. 1987).  Where "the summary judgment evidence establishes that one

of the essential elements of the plaintiff's cause of action does not exist as a matter of

law, . . . all other contested issues of fact are rendered immaterial.  *See Celotex*, 477

U.S. at 323, 106 S.Ct at 2552."  *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir.

1992).  In making its determinations of fact on a motion for summary judgment, the

Court must view the evidence submitted by the parties in a light most favorable to the

non-moving party.  *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

    The moving party has the duty to demonstrate the lack of a genuine issue of

material fact and the appropriateness of judgment as a matter of law to prevail on his

motion.  *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The

movant accomplishes this by informing the court of the basis of its motion, and by

identifying portions of the record which highlight the absence of genuine factual issues.

*Topalia*n, 954 F.2d at 1131.

    "Rule 56 contemplates a shifting burden:  the nonmovant is under no obligation

to respond unless the movant discharges [its] initial burden of demonstrating

[entitlement to summary judgment]."  *John*, 757 F.2d at 708.  "Summary judgment

cannot be supported solely on the ground that [plaintiff] failed to respond to defendants'

motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'"  *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## ADMISSIBILITY OF EXPERT TESTIMONY

Since the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), federal courts have

heeded the admonition set forth therein that they should take seriously their role as "gatekeepers" of testimony offered by expert witnesses in federal courts.  The initial reaction to *Daubert* was that it was a victory for the *Daubert* plaintiffs in that it vacated a Ninth Circuit opinion which upheld the exclusion of the plaintiff's experts in one round of the Bendectin birth defect cases.  The Supreme Court in *Daubert* said the *Frye* general acceptance test for expert testimony had been superseded by Rule 702 of the Federal Rules of Evidence which went into effect in 1975.  Rule 702 provided at the time:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A primary requisite of the rule was that the evidence or testimony "assist the trier of fact to understand the evidence or determine a fact in issue."  The commentators universally agree that the effect of *Daubert* was not the loosening of the allowance of expert testimony but in fact a tightening thereof.  In fact when *Daubert* was vacated and remanded to the Ninth Circuit, the Ninth Circuit again upheld the district court's exclusion of the plaintiff's expert witnesses based on the new standard enunciated in *Daubert*. *Wm. Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 43 F. 3d 1311 (9th Cir. 1995).  Thereafter the United States Supreme Court denied certiorari.  *Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

The cases and commentaries interpreting *Daubert* are legion at this point.  The Supreme Court in *Daubert* enumerated several factors to be considered by the trial

court in determining whether or not a particular expert witness's testimony was relevant and reliable to the point that it should be allowed in federal court.  Those factors are not exclusive and were merely presented as a guideline.  The federal courts were instructed that the *Daubert* standard is "a flexible one" to be applied according to the facts and circumstances of each individual case.  509 U.S. at 594.

After *Daubert*, there was much discussion as to whether or not it applied merely to cases involving scientific knowledge or whether it should be expanded to include all expert testimony regardless of its scientific basis.  The Supreme Court answered that question in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999).  The *Kumho* court held

> We conclude that *Daubert's* general holding--setting forth the trial judge's general "gatekeeping" obligation--applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.

119 S. Ct. at 1171.  Ultimately "the objective of that [gatekeeping] requirement is to insure the reliability and relevancy of expert testimony."  *Kumho*, 119 S. Ct. at 1176.  In *Kumho* "the relevant issue was whether the expert could reliably determine the cause of [the] tire's separation."  119 S. Ct. at 1177.

This court has been instructed by *Kumho* interpreting *Daubert* that the opinions stated by Mr. McEachern are not the only objects of the relevancy and reliability determination.  Indeed, the court is also required to determine the reliability of his basis for arriving at those conclusions. 119 S.Ct. at 1177.  The factors set forth in *Daubert* and recited in *Kumho* include whether the theory or technique can be and has been tested;

whether or not it has been subjected to peer review and publication; whether, in respect

to a particular technique, there is a high known or potential rate of error; whether there

are standards controlling the technique's operation and whether the theory or technique

enjoys general acceptance within a relevant scientific community.

This court recognizes that several of the factors listed above are not relevant to a

determination of the issue before this court.  Therein lies the flexibility of the

gatekeeping responsibility as mandated by the Supreme Court.  As the Fifth Circuit has

noted, several prior opinions on admissibility of expert testimony placed undue

emphasis on *qualifications* of a particular expert witness over the *reliability* of that

expert's proposed testimony and such reflected a "pre-*Daubert*" sensibility.  *See,*

*Watkins v. Telsmith*, 121 F. 3d 984, 992 (5th Cir. 1997).  In this age of "post-*Daubert*"

sensibility, especially as enlightened by the United States Supreme Court's

pronouncements in *Kumho*, the trial courts were instructed to carefully execute the

responsibility placed upon the court as a "gatekeeper" of proposed expert testimony.

In response to *Daubert* and the many cases applying *Daubert*, including *Kumho*,

Federal Rule of Evidence 702 was amended effective December 1, 2000, by adding

three requirements for the admissibility of expert testimony.  *See Hodges v. Mack*

*Trucks Inc.*, 474 F.3d 188 (5th Cir. 2006).  As amended, Rule 702 now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to the facts of
> the case.

The *Daubert* factors remain relevant to the determination of the reliability of expert testimony under Rule 702, as amended. *See Guy v. Crown Equipment Corp.* 394 F.3d 320, 325 (5th Cir. 2004). In assessing the basis of an expert's proposed testimony, the Fifth Circuit has held that an "expert's testimony [can be] based mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002).

Ultimately, however, the question of whether an expert's testimony is reliable is a fact-specific inquiry. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir.2004). The proponent of the expert testimony must prove reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). "It is then the district court's responsibility to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed.Appx. 395, 398 (5th Cir. 2007) (quoting *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167).

Therefore, before Dr. Long may testify, this court must, at a minimum, determine that (1) he is qualified to offer opinion testimony; (2) he has employed sound methodology in forming his opinions; (3) the data he relied on in forming his opinions is reliable; and, most importantly, (4) his opinion testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Of course, the burden of establishing the admissibility of Dr. Long's testimony falls on plaintiffs, as the

proponents of that expert testimony. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *Daubert*, 509 U.S. at 592, n. 10.

Finally, if an expert's testimony survives the threshold scrutiny under Rule 702, it is subject to further review under Rule 403. *See Daubert*, 509 U.S. at 595; *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996). "[E]xpert evidence can be both powerful and quite misleading . . . [Rule] 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. To this end, an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

## ANALYSIS

### Track Classification

The court will address the *Daubert* motion to exclude the testimony of Dr. Long first as that will have a major impact on the summary judgment issues. Dr. Long has first proffered opinions on track classification and slow orders/excessive speed. Because of this court's previous grant of summary judgment on these issues and the exclusion of the testimony of Alan Blackwell, Dr. Long's testimony is due to be excluded on these issues as well.

### Interpretation of Mississippi Traffic Statutes

-12-

Next, Dr. Long offers opinions on the interpretation of various Mississippi traffic statutes dealing with the duties of motorists and speed limits of automobiles. Dr. Long's opinions in this regard invade the province of the court to determine and instruct what the law is. As such, they are improper, irrelevant and not helpful to the jury. *See e.g., Fowler v. State Farm Fire & Casualty*, 2008 WL 3050417 (S.D. Miss. July 25, 2008) (excluding expert testimony on the interpretation of Mississippi law in an insurance coverage dispute); and *Grosch v. Tunica County, Mississippi*, 2008 WL 2692609 (N.D. Miss. July 2, 2008) (holding that an expert could not testify on the meaning of the Mississippi gaming statutes and concluding that "[s]imply stated, it is solely within the court's province to instruct the jury regarding the meaning of the law.").

**Application of Engineering Standards**

Dr. Long apparently intends to proffer an opinion on the standards, customs and practices applicable to railroads which are applicable to professional engineers which impose requirements on the railroads even though such standards have never been adopted into law. However, Dr. Long fails to identify with specificity which standards, customs and practices he contends apply, even though he generally discusses standards governing sight distances and vegetation removal at crossings. However, Dr. Long's opinion in this regard is contrary to Mississippi law. The Mississippi Supreme Court has stated that the duties and obligations on the part of a railroad at a grade crossing is "predominately" a matter of statutory law. *See Alabama Great Southern R.R. Co. v. Lee*, 826 So.2d 1232, 1236 (Miss. 2002). Indeed, Miss. Code Ann. §§ 77-9-

254(I) and 77-9-249 specifically address these issues.  Dr. Long's opinions in this regard are irrelevant, contrary to law and not helpful to the jury and shall be excluded. *See Wilner v. Miss. Export R.R. Co.*, 546 So.2d 678 (Miss. 1989).


**Extra-hazardous Crossing**

Mississippi law recognizes that all railroad crossings have the potential for danger.  A railroad is considered negligent, however, only if a plaintiff proves that the railroad crossing was unusually dangerous or extraordinarily hazardous and that the railroad failed to take reasonable precautions commensurate with the unusually dangerous condition of the crossing.

The plaintiffs assert that the duty of reasonable care owed by the Railroad with regard to maintenance of their public crossings and immediately surrounding area does not come and go or rise and fall dependent on what someone else does or even what a negligent driver may do, but rather the duty and the performance of that duty is measured by all the relevant circumstances as they exist at the time of an accident. Plaintiffs are correct that railroads not only have statutory duties, but they also owe common law duties both as to railroad operations and crossing maintenance.

In this regard, the plaintiffs' expert, Dr. Long, has opined that it is reasonable to believe that the roadway conditions at the Hartley Lane crossing were contributing factors to the subject accident because it is common knowledge in the railroad industry that certain conditions create hazards for drivers at railroad crossings.  Dr. Long contends that the overall condition of the railroad crossing and tracks was not

reasonably safe, especially for a 32-foot long commercial garbage truck.

To support this theory, Dr. Long states that the angle of the skewed crossing at the turn onto Hartley Lane interfered with John Brown's ability to look and listen for trains on the day of the accident.  According to him, the Waste Management truck had to turn an extra 25 degrees, which created a situation more distracting to a driver than if it was a standard 90 degree turn.  Moreover, Dr. Long insists that  the crossing surface was rough and had loose ballast within a couple of feet of the closest rail on both sides of the tracks and that this generally creates a distraction which diverts a driver's attention by requiring a driver to find a smooth path over a rough crossing.

Dr. Long has also opined that the pavement on Hartley Lane was dangerously narrow leading up to the railroad crossing.  He states that even though Hartley Lane is a two-way road, the pavement is so narrow in places that only one vehicle can pass at a time, especially when a garbage truck is traversing the road.  Dr. Long concludes "this creates a problem where a motorist needs to be looking to the left and right for trains as well as looking ahead for potential oncoming vehicles that are going to compete for the use of the one lane that's provided."

Dr. Long also cites to the AREMA standards to support his conclusion that the crossing is dangerously steep and "humped."  Dr. Long states, "The diversion of motorist attention due to an incline is compounded when the crossing surface is rough and motorists . . . must look ahead to find a smooth path before getting too close to potholes or surface defects."

However, as the defendants point out, John Brown and Robert Purnell cannot

remember the exact events surrounding the collision and, thus, there is no evidence to support that any of these conditions caused the subject accident.  There is absolutely no evidence from any witness that John Brown's attention was diverted by any of these alleged crossing conditions on the date of the accident.

Thus, the defendants assert that the plaintiffs' claims that the condition of the crossing was a proximate cause of the collision and derailment is nothing more than mere speculation and conjecture without eyewitness testimony.  The plaintiffs respond that what the defendants fail to acknowledge, however, is the actual physical evidence evaluated by experts in this case who have opined that the Railroad failed to provide a reasonably safe highway grade crossing at Hartley Lane.

However, the court has already excluded the testimony of Alan Blackwell and the exclusion of Dr. Long's testimony is now under consideration.  The court agrees with the defendants that Dr. Long's testimony and opinions in regard to the condition of the crossing and its proximate cause of the accident are mere speculation and conjecture. They are mere possibilities not probabilities based on reliable testimony or evidence surrounding the condition of this crossing on the date of the accident when John Brown drove his truck across it in front of the Amtrak train.

The plaintiffs argue that it is well settled law that "[n]egligence may be proven by circumstantial evidence in the absence of testimony by eye witnesses, provided the circumstances are such so as to take the case out of the realm of conjecture and place it within the field of legitimate inference."  *Leflore County v. Givens*, 754 So.2d 1223, 1230 (Miss. 2000)(citing *K-Mart Corp. v. Hardy*, 735 So.2d 975, 981 (Miss.1999)).

Circumstantial evidence is certainly capable of supporting an inference of negligence under Mississippi law. However, speculation and conjecture are not circumstantial evidence.

## Inadequate Sight Distance

The plaintiffs next argue that the defendants were negligent because there was inadequate sight distance due to vegetation on the Illinois Central right-of-way. However, the evidence reveals that at no time while the truck was on Hartley Lane was the train obscured by any vegetation.

The Mississippi Legislature has established the required sight distance for public railroad crossings in Mississippi. Miss. Code Ann. § 77-9-254 provides:

> At all public highway railroad grade crossings that do not have automatic flashing lights and/or gates where vegetation would materially obstruct the view of a vehicle operator exercising reasonable care of a train approaching a grade crossing from either direction, every railroad, as is reasonably practical, shall remove from its right-of-way which it owns or operates, such vegetation as weeds, brush, climbing vines, shrubbery and trees, for a distance of not less than three hundred (300) feet in each direction from the centerline of the public road or highway, unless the authorized train speed is ten (10) miles per hour or less, in which case the distance from the centerline of the public road or highway shall be not less than one hundred (100) feet. At the outer edges of the public road or highway, the vegetation shall be removed to a width of twenty-five (25) feet on each side of the centerline of the railroad or to the full width of the railroad's operating right-of-way whichever is shorter. The area cleared of vegetation may be tapered inward from its full width at the involved roadway to the outer limits of the area being cleared so as to create a triangle, or it may be cleared at a constant width so as to form a rectangle.

Miss. Code Ann. § 77-9-254(1).

The evidence produced in this case reveals that the sight distance from the

railroad advance warning sign twenty-two feet from the rails up the tracks northward is approximately 2,658 feet.  Dr. Long even testified that he measured the visibility distance twenty-five feet from the track as over 2,000 feet.  There is no genuine issue of fact concerning adequate sight distance.

Nevertheless, the plaintiffs' Dr. Long opines that the sight distance was inadequate because Mississippi motorists are not required to stop unless they detect an approaching train or are directed to do so by flashing lights or a flagman.  Dr. Long's testimony that Brown's sight distance was so impaired as to not require him to stop before entering the crossing is simply incredulous.  Indeed, Brown's failure to stop in the face of a rapidly approaching train leads to the consequences intended to be avoided by the statutory and common law requirements that a motorist be observant and use extreme caution when approaching all train crossings, whether protected or not.  *See* Miss. Code Ann. § 77-9-249 (requiring all Mississippi motorists to use senses in detecting approaching trains).

Further, Brown himself testified that he had traversed this very crossing hundreds of times without assistance and with no hindrances to him seeing approaching trains.  A t least eight other witnesses who live in the Hartley Lane area have also testified that they had never had a problem seeing approaching trains when using this crossing and that the sight distance was adequate.  There is no genuine dispute as to the adequacy of sight distance at this crossing relative to this accident and Dr. Long's testimony on this issue is irrelevant, contradictory to the facts and not helpful to the jury.

-18-

**Failure to Install Active Warning Devices**

The plaintiffs assert that the numerous conditions at the Hartley Lane crossing as discussed above and opined about by the experts suggest that a jury question exists as to whether the Railroad should have installed active warning devices at this alleged extra-hazardous railroad crossing.  However, the court has determined that there is no genuine dispute as to any of the issues raised by the plaintiffs which could lead a trier of fact to find the Hartley Lane crossing was extra-hazardous at the time and under the conditions of this accident.

Further, Dr. Long's testimony about the condition and placement of the advance warning signs is simply irrelevant.  First, the defendants had no duty to place or maintain the signs under any federal regulation or Mississippi law.  That duty rests with the governing municipality who has jurisdiction over the roadway crossing the track. Additionally, Brown had traversed this crossing hundreds of times and has testified that he never had a problem with knowing it was there or with seeing approaching trains. There is absolutely no genuine dispute that the failure to have active signals at this crossing was a proximate cause of this collision.  Dr. Long's testimony to the contrary is irrelevant, contrary to the facts and law and would not be helpful to the jury.


**Failure to Sound Train Horn**

The plaintiffs have alleged that locomotive engineer Cheatwood failed to sound the train's horn for 900 feet on approach to the crossing as required by Mississippi law. The appropriate statute on point is Miss. Code Ann. §77-9-225, which states, in

pertinent part:

> Every railroad company shall cause each locomotive engine run by it to be provided with a bell . . . and a whistle or horn which can be heard distinctly at a distance of three hundred (300) yards, and shall cause the bell to be rung or the whistle or horn to be blown at the distance of at least three hundred (300) yards from the place where the railroad crosses over any public highway or municipal street. The bell shall be kept ringing continuously or the whistle or horn shall be kept blowing at repeated intervals until said crossing is passed.

According to the plaintiffs, testimony of residents in the neighborhood supports their argument that the Amtrak train's horn did not blow in continuous repeated intervals beginning 300 yards from the crossing and that witnesses could not distinctly hear the train's horn at a distance of 300 yards before reaching the Hartley Lane crossing.

Christopher Murray, a bystander who is a resident of the Hartley Lane neighborhood near the railroad crossing, was outside under the tree in his yard getting ready to light up his barbecue grill when the incident occurred on May 27, 2008.  Murray testified repeatedly in his deposition he only heard the train blow its horn one time.  In describing the incident, Murray testified that "out of nowhere . . . it was just this big loud blow that . . . scared me."   He was asked by counsel for the Railroad, "Could you see the train at the time you heard the blow?"  Murray responded, "Yes. I saw the front end of the train."  When asked if he knew when the train first blew its horn, Murray stated:

> A. Well, I–I'll just tell you like this. I heard–it was so loud that–that it felt like it was just right up on me, and that's what made me jump.
>
> Q. Okay.
>
> A. So I would say it was pretty close.
>
> Q. Do you have an estimate in terms of the number of feet?

-20-

A. I would say probably–maybe 15 to 20 feet. I don't know how–

After being asked by counsel for the Railroad if he would "agree it's possible the train had been blowing longer" if an event recorder "showed the train was blowing approximately 1,200 feet before the impact," Murray again consistently stated he only heard it blow one time immediately before impact and that it was not possible it blew any other times.  Murray also marked on Exhibit 3 to his deposition the spot where he first saw the front of the train and began hearing the horn blow.  The sight distance from the barbecue grill at Murray's house down the track to the north was approximately 250 feet to this spot.

Betty Williams, another witness, testified "I heard it blow one time.  I know it blowed one time."  When asked by counsel if it could have blown more than once, she responded: "I don't think so, because I'm right at that track." She was then asked how long it blew, and she responded: "Just that one time, not very long."  Further, Ernest Herron and Leon Sartin, both of whom were in the area of the Hartley Lane neighborhood at the time of the collision, testified they did not hear the train's horn at all.

The defendants point to the event data recorder from the train indicating the horn was blown approximately ten seconds before impact when the locomotive was 1,170 feet from the crossing as being conclusive of this issue.  There are also a number of eye witnesses who support the defendants' contention that the train horn was sounded for a long period of time prior to the collision.  But, even some of these favorable witnesses are less than pellucid on the interval between hearing the train horn and the collision..

Taking all of the evidence in the light most favorable to the non-moving party, the

court finds that there is a genuine dispute as to whether the train horn was sounded at the appropriate statutory interval so as to give Brown adequate warning of the train's eminent approach.  However, Dr. Long's speculative testimony on the alleged fallacy and possible manipulation of the train event data recorder is inappropriate, unsupported by relevant data or evidence and would not be helpful to the jury.  The issue of the train horn is merely a factual dispute between various eye witnesses and the mechanical event data recorder perfectly capable of being resolved by a properly instructed jury. That, and the appropriate damages of the plaintiffs, if any, will be the only issues decided by the jury in this case.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion to Exclude Testimony of Dr. Gary Long **[#255]** is granted.

IT IS FURTHER ORDERED AND ADJUDGED that the Motion for Summary Judgment **[#246]** filed on behalf of the defendants is granted on every issue except the one concerning Amtrak's failure to properly sound the train horn before the collision.  A separate judgment shall be entered herein in accordance with Rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 28th day of March, 2011.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE